**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| DEANE MOSS and SHERRY MCCARGO RIDDICK, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>I.A.C., INC. d/b/a INDUSTRIAL ACCEPTANCE CORPORATION,<br><br>Defendant. | Case No. _____<br><br>**JURY TRIAL DEMANDED**<br><br>June 11, 2026 |

## CLASS ACTION COMPLAINT

Plaintiffs Deane Moss and Sherry Mccargo Riddick ("Plaintiffs"), individually and on behalf of all others similarly situated, bring a class action complaint against Defendant I.A.C., Inc. d/b/a Industrial Acceptance Corporation ("I.A.C." or "Defendant") and allege, upon personal knowledge as to their own actions and counsel's investigations, and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.      Plaintiffs bring this class action against I.A.C. for its failure to properly secure and safeguard sensitive information that I.A.C.'s borrowers entrusted to it, including, without limitation, individuals' names and payment card information (collectively, "personally identifiable information" or "PII").

2.      I.A.C. is a "lender within the credit challenged pool of consumers on the East Coast" and claims to be "doing business with over 1,000 franchise and independent automotive dealers."[1]

3.      On or around February 24, 2025, I.A.C. experienced a data breach, during which cybercriminals accessed or acquired the above-referenced PII (the "Data Breach"), along with additional information stored on I.A.C.'s information technology network.

4.      Although I.A.C. learned of the intrusion March 4, 2025, I.A.C. waited over a year, until on or around May 28, 2026, to disclose the data breach incident to the public and to Plaintiffs.

5.      As a credit company in the automotive lending industry, Plaintiffs and Class Members have to share sensitive information including Social Security numbers, driver's license information, credit reports, account payment history, and other information in order to seek I.A.C.'s approval for a credit line and to make payments for loans. According to Plaintiffs' data breach notification letters, at least Plaintiffs' names and Social Security numbers were confirmed to have been compromised.

6.      Prior to and through at least March 4, 2025, I.A.C. obtained Plaintiffs' and Class Members' PII, and stored that PII in an internet-accessible environment on I.A.C.'s network.

7.      Upon information and belief, the Data Breach has impacted 79,216[2] of Defendant's current and former borrowers.

---

[1] "About IAC CREDIT," https://iaccredit.com/index.php?option=com_content&view=article&id=80&Itemid=482 (last accessed June 9, 2026).

[2] *See Data Breach Notices*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/c2a95af1-d639-45ab-ab0d-8dbefca3f72a.html (last visited June 9, 2026).

8.     According to the breach notice that I.A.C. provided to the Maine Attorney General's Office, the group "INC" was responsible for the ransomware.[3] However, Akira, another cybercriminal, claimed to have been the threat actor that breached I.A.C.'s systems.[4]

9.     By obtaining, collecting, using, and deriving a benefit from the Plaintiffs' and Class Members' PII, I.A.C. assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

10.     The exposed PII of Plaintiffs and Class Members can be sold on the dark web. Hackers can access and then offer unencrypted, unredacted PII for sale to criminals. Plaintiffs and Class Members now face a life-long risk of (i) identity theft and (ii) the sharing and detrimental use of their sensitive information.

11.     The PII was compromised due to I.A.C.'s negligent and/or careless acts and omissions and its failure to protect Plaintiffs' and Class Members' PII. In addition to I.A.C.'s failure to prevent the Data Breach, I.A.C. has not disclosed any details regarding the Data Breach to Plaintiffs and Class Members. I.A.C. has also purposefully withheld the specific vulnerabilities and root causes of the Data Breach and has not disclosed that information to Plaintiffs and Class Members.

12.     As a result of this delayed response, Plaintiffs and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

13.     Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of I.A.C.'s failure to: (i) adequately protect Plaintiffs' and Class Members' PII; (ii) warn

---

[3] *Id.*

[4] *Industrial Acceptance Corporation*, BREACHSENSE, https://www.breachsense.com/breaches/industrial-acceptance-corporation-data-breach/ (last visited June 9, 2026).

Plaintiffs and Class Members of I.A.C.'s inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures. I.A.C.'s conduct amounts to negligence and violates federal and state statutes.

14.    Plaintiffs and Class Members have suffered injury as a result of I.A.C.'s conduct. These injuries include:

a.    lost or diminished value of their PII;

b.    out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

c.    lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time;

d.    the disclosure of their private information;

e.    time needed to investigate, correct, and resolve unauthorized access to their accounts, as well as time needed to deal with spam messages and emails received subsequent to the Data Breach;

f.    charges and fees associated with fraudulent charges on their accounts; and

g.    the continued and increased risk to their PII, which: (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) may remain backed up in I.A.C.'s possession and is subject to further unauthorized disclosures so long as I.A.C. fails to undertake appropriate and adequate measures to protect that PII.

15.    I.A.C. disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class Members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable,

4

required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, Plaintiffs' and Class Members' PII was compromised through disclosure to an unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## **PARTIES**

16.     Plaintiff Deane Moss is a citizen of New York, residing in Queensbury, New York.

17.     Plaintiff Sherry McCargo Riddick is a citizen of Connecticut, residing in Waterbury, Connecticut.

18.     Defendant, I.A.C., Inc. d/b/a Industrial Acceptance Corporation, is a stock corporation organized under the laws of the state of Connecticut with a principal place of business at 138 Orange St., New Haven, Connecticut, 06510.

19.     All of Plaintiffs' claims stated herein are asserted against Defendant and any of its respective owners, predecessors, successors, subsidiaries, agents and/or assigns, the individual identities of which are not known to Plaintiffs at this time.

## **JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Minimal diversity exists because putative Class Members reside outside the State of Connecticut. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

21.     This Court has general personal jurisdiction over I.A.C. because it operates, conducts, engages in, or carries on a business or business venture in this State.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because I.A.C. resides in this District, and a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### *Defendant's Business and Data Collection*

23.     I.A.C. is the "#1 lender within the credit challenged pool of consumers on the East Coast."[5]  According to Defendant, it provides "non-prime" automotive lending to consumers at over 1,000 franchise and independent automotive dealers.

24.     In the ordinary course of business, I.A.C. compiles and stores a significant volume of sensitive personal, financial, and private information from hotel guests, such as the PII compromised in the Data Breach.

25.     To conduct its business, I.A.C. collects credit applications that include sensitive information such as social security numbers, income, and references.[6] I.A.C. also obtains credit reports, information from employers, landlords, mortgage companies, insurance agencies,

---

[5] About IAC Credit, IAC, https://iaccredit.com/index.php?option=com_content&view=article&id=80&Itemid=482 (last visited June 9, 2026).

[6] Privacy Notice, IAC, https://iaccredit.com/index.php?option=com_content&view= article&id=81:iac-privacy-statement&catid=86:page-buttom&Itemid=476 (last visited June 9, 2026).

residence and insurance coverage.[7] Furthermore, I.A.C. collects loan account information, including Plaintiffs' payment history and balances.[8]

26.    I.A.C. understood the need to protect its current and former clients' Private Information and prioritize its data security.

27.    I.A.C. states in its Privacy Notice that "we are committed to protecting the personal information we obtain about you. We want you to know that we take strong precautions to make sure the information we collect is not shared with anyone who should not have it."

28.    I.A.C. further promises to "limit access to your information to only those Industrial Acceptance Corporation employees who have a need to know."[9]

29.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, I.A.C. assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from unauthorized disclosure.

30.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII.

31.    Plaintiffs and Class Members relied on I.A.C. to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

32.    I.A.C. collected Plaintiffs' and Class Members' PII and stored it unencrypted, on I.A.C.'s internet-accessible network.

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

33.     I.A.C. had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' PII from involuntary disclosure to third parties.

### *The Data Breach*

34.     I.A.C. is a "lender within the credit challenged pool of consumers on the East Coast" and claims to be "doing business with over 1,000 franchise and independent automotive dealers."[10]

35.     On or around February 24, 2025, I.A.C. experienced a data breach, during which cybercriminals accessed or acquired the above-referenced PII (the "Data Breach"), along with additional information stored on I.A.C.'s information technology network.

36.     On or around March 4, 2025, I.A.C. "learned that files were taken from our network by an unauthorized user."

37.     I.A.C. waited over a year to inform those impacted about the breach.

38.     According to a breach notification letter Plaintiffs received on or around May 28, 2026, I.A.C. conducted a "review of the files involved to understand the data potentially involved, whether those files contained personal information, and if so, to whom the data related." I.A.C. completed the review on May 11, 2026. Based on this review, I.A.C. determined that Plaintiffs' information was a part of the compromised data set.

39.     I.A.C. stated in the breach notification letter that Plaintiffs' first name, last name, and social security number were compromised.

---

[10] About IAC Credit, IAC, https://iaccredit.com/index.php?option=com_content&view=article&id=80&Itemid=482 (last visited June 9, 2026).

40.    Prior to and through at least March 4, 2025, I.A.C. obtained Plaintiffs' and Class Members' PII, and stored that PII in an Internet-accessible environment on I.A.C.'s network.

41.    By obtaining, collecting, using, and deriving a benefit from the Plaintiffs' and Class Members' PII, I.A.C. assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

42.    According to the breach notice that I.A.C. provided to the Maine Attorney General's Office, the group "INC" was responsible for the ransomware.[11] However, Akira, another cybercriminal, claimed to have been the threat actor that breached I.A.C.'s systems.[12]

43.    It is unusual that two separate threat actors claim to have been able to infiltrate I.A.C.'s system.

44.    INC first surfaced in July 2023.[13] It operates as a ransomware-as-a-service platform, where a "core" group performs functions such as developing the ransomware malware and encryption tools and running INC's dark web "leak site."[14] INC "affiliates" handle the breaches themselves and negotiate with affected companies.[15] Thus, under such a model, many anonymous individuals on the dark web have access to stolen data after a data breach.

---

[11] *Data Breach Notices*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/c2a95af1-d639-45ab-ab0d-8dbefca3f72a.html (last visited June 9, 2026).

[12] *Industrial Acceptance Corporation*, BREACHSENSE, https://www.breachsense.com/breaches/industrial-acceptance-corporation-data-breach/ (last visited June 9, 2026).

[13] Paul Bischoff, *Auto lender IAC warns 79,000+ people of data breach that leaked SSNs*, COMPARITECH (May 29, 2026), https://www.comparitech.com/news/auto-lender-iac-warns-79000-people-of-data-breach-that-leaked-ssns/ ("Bischoff article").

[14] *INC Ransom: The Ransomware Group That Abandoned All Ethical Boundaries*, BREACHED.COMPANY (Nov. 23, 2025), https://breached.company/inc-ransom-the-ransomware-group-that-abandoned-all-ethical-boundaries/.

[15] *Id.*

45.    INC hacks into organization's computer networks using techniques such as spear phishing and exploiting known vulnerabilities in software.[16] Once inside, INC's malware both steals data and locks down computer systems until a ransom is paid to unlock them.[17]

46.    Akira is a notorious cybercriminal group that was the subject of a United States Cybersecurity and Infrastructure Security Agency ("CISA") Advisory.[18]

47.    In its Advisory, CISA warned organizations that Akira is known to obtain "initial access to organizations through a virtual private network (VPN) service without multifactor authentication (MFA) configured, mostly using known Cisco vulnerabilities."[19]

48.    Once it breaks into an organization's network, Akira exfiltrates (*i.e.*, steals) data then encrypts it utilizing a sophisticated hybrid encryption scheme.[20] Akira threat actors use a double-extortion model, demanding a ransom payment to unlock data, and, to further apply pressure, threatening to leak the stolen data on its dark web portal if a ransom payment is not made.[21]

49.    Akira is active on the dark web, maintaining two sites – one displaying information about the group and advertising stolen records from data breach victims, and the other for negotiations.[22]

---

[16] *See* Bischoff article.

[17] *Id.*

[18] *#StopRansomware: Akira Ransomware*, CISA (Apr. 18, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-109a.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] Jaime Andres and Bello Vieda, *A spotlight on Akira ransomware from X-Force Incident Response and Threat Intelligence*, SECURITY INTELLIGENCE (May 2, 2024), https://securityintelligence.com/x-force/spotlight-akira-ransomware-x-force/.

50.     On or about March 12, 2025, Akira published a post on one of its dark web websites naming IAC.[23]

```
2025-03-12 | Indastrial Acceptanc | IAC offers consumer financing to both the Retail and Direct Sales |
           | e Corporation        | market.                                                          |
           |                      |                                                                  |
           |                      | We are ready to upload more than 60 GB of essential corporate doc |
           |                      | uments such as: financial data (audits, payment details, reports) |
           |                      | , health condition certificates, inside correspondences, etc.    |
```

51.     Akira's post named Defendant, and stated "IAC offers consumer financing to both the Retail and Direct Sales market. We are ready to upload more than 60 GB of essential corporate documents such as: financial data, (audits, payment details, reports, health condition certificates, inside correspondences, etc."[24]

52.     Akira's post indicates it stole 60 gigabytes of data – including a vast quantity of Plaintiffs' and Class Members' sensitive Private Information, including their Social Security numbers.[25]

53.     Since the post was created on March 12, 2025, over a year ago, on information and belief, Plaintiffs' and the Class's Private Information has already been published on the dark web.

54.     On information and belief, I.A.C. has not made any public statements about whether it had paid the ransomware.

---

[23] *See* Bischoff article.

[24] *Id.*

[25] *Id.*

55.    However, even if they had, there is no guarantee that the Private Information stolen in the Data Breach will be deleted.[26] The stolen Private Information is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[27]

56.    Thus, on information and belief, Plaintiffs' and Class Members' stolen PII has already been published by INC, Akira, and/or other cybercriminals on the dark web.

57.    Because I.A.C. had a duty to protect Plaintiffs' and Class Members' PII, I.A.C. should have accessed readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

58.    Plaintiffs' and Class Members' unencrypted  PII may now appear on the dark web or simply fall into the hands of companies that will use the information for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals have or can easily access and view Plaintiffs' and Class Members' PII.

### I.A.C. Stores Plaintiffs' and Class Members' PII

59.    I.A.C. obtained and stored a massive amount of PII. As a condition of employment, I.A.C. required its employees to handle its customers' highly confidential PII.

60.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, I.A.C. assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

---

[26] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.

[27] *Id.*

12

61.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on I.A.C. to keep this information confidential and securely maintained, and to make only authorized disclosures of this information.

### *PII is Valuable and Subject to Unauthorized Disclosure*

62.     I.A.C. was aware that the PII it collected is highly sensitive and of significant value to those who would use it for wrongful purposes.

63.     PII is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft and financial fraud.[28]  Indeed, a robust illegal market exists in which criminals openly post stolen PII on multiple underground websites, commonly referred to as the "dark web." Moreover, "fullz" packages, which include "extra information about [a] legitimate credit card owner" in case a scammer's "bona fides" are challenged when they attempt to use the credit card, are also offered on the dark web.[29]

64.     The ramifications of I.A.C.'s failure to keep Plaintiffs' and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for months or even years thereafter.

65.     Further, criminals often trade stolen PII for years following a breach. Cybercriminals can post stolen PII on the internet, thereby making such information publicly available.

---

[28] Federal Trade Commission Consumer Advice, *What To Know About Identity Theft*,https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited June 9, 2026).

[29] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited June 9, 2026).

66.     I.A.C. knew, or should have known, the importance of safeguarding PII entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Plaintiffs and Class Members because of a breach. I.A.C. failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### The Data Breach Exposed Plaintiffs and Class Members to Identity Theft and Out-of-Pocket Losses

67.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of their rights. They are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

68.     Despite all the publicly available knowledge of known and foreseeable consequences of the disclosure of PII, I.A.C.'s policies and practices with respect to maintaining the security of Plaintiffs' and Class Members' PII were reckless, or at the very least, negligent.

69.     In virtually all contexts, the expenditure of time has consistently been recognized as compensable, and for many people, it is the basis on which they are compensated. Plaintiffs and Class Members should be compensated for the time they have expended because of I.A.C.'s misfeasance.

70.     Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[30]

---

[30] 2025 LexisNexis True Cost of Fraud Study,  https://risk.lexisnexis.com/insights-resources/research/us-ca-true-cost-of-fraud-study (last visited June 9, 2026).

14

71.     As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer financial loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

      a.     invasion of privacy;

      b.     theft of their PII;

      c.     lost or diminished value of their PII;

      d.     lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

      e.     loss of the benefit of their bargain;

      f.     time needed to investigate, correct, and resolve unauthorized access to their accounts, as well as time needed to deal with spam messages and emails received subsequent to the Data Breach;

      g.     charges and fees associated with fraudulent charges on their accounts;

      h.     statutory damages;

      i.     nominal damages; and

      j.     the continued and certainly increased risk to their PII, which: (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in I.A.C.'s possession and is subject to further unauthorized disclosures so long as I.A.C. fails to undertake appropriate and adequate measures to protect the PII.

### *I.A.C. Violated FTC Guidelines*

72.     The Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, prohibited I.A.C. from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal

Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' PII is an "unfair practice" in violation of the FTCA. See, e.g., Fed. Trade Comm'n v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015).

73.    The FTC has promulgated several guides for businesses that reflect the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[31]

74.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established data security guidelines for businesses.[32]  The guidelines reflect that businesses should protect the PII that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

75.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to confidential data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[33]

76.    The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and

---

[31] Federal Trade Commission, *Start With Security: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 9, 2026).

[32] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited June 9, 2026).

[33] Federal Trade Commission, *Start With Security*, *supra* note 13.

16

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

77.     I.A.C. failed to properly implement basic data security practices. I.A.C.'s failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

### *Plaintiff Deane Moss*

78.     Plaintiff Deane Moss financed a car that he purchased in 2024 from J&M Automotive Services with I.A.C

79.     In the course of his dealings with I.A.C., Mr. Moss gave I.A.C. his PII, including but not limited to his full name, date of birth, Social Security number, driver's license number, employment information, income information, and other information related to the financing and payment of his vehicle, all of which may also have been compromised during the breach.

80.     I.A.C. obtained Mr. Moss's PII in the course of conducting its regular business operations. At the time of the Data Breach, I.A.C. retained Mr. Moss's PII.

81.     Mr. Moss greatly values his privacy and is very careful about sharing his sensitive PII. Mr. Moss diligently protects his PII, takes proactive steps to ensure that his PII is kept safe and secure, and stores any documents containing his PII in a safe and secure location. Mr. Moss has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

82.     I.A.C. obtained and continues to maintain Mr. Moss's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

83.     The Data Breach has caused Mr. Moss to suffer substantial injury, as well as imminent and impending injury arising from the substantially increased risk of additional fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

84.     As a result of the Data Breach, Mr. Moss is at present risk and will continue to be at increased risk of additional identity theft and fraud for years to come.

85.     Mr. Moss has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in I.A.C.'s possession, is protected and safeguarded from future breaches.

### *Plaintiff Sherry Mccargo Riddick*

86.     Plaintiff Sherry Mccargo Riddick financed a car that she purchased in December of 2017 from J&M Automotive Services with I.A.C.

87.     In the course of her dealings with I.A.C., Ms. Riddick gave I.A.C. her PII, including but not limited to her full name, date of birth, social security number, driver's license number, employment information, income information, and other information related to the financing and payment of her vehicle, all of which may also have been compromised during the breach.

88.     I.A.C. obtained Ms. Riddick's PII in the course of conducting its regular business operations. At the time of the Data Breach, I.A.C. retained Ms. Riddick's PII.

89.     Ms. Riddick greatly values her privacy and is very careful about sharing her sensitive PII. Ms. Riddick diligently protects her PII, takes proactive steps to ensure that her PII is kept safe and secure, and stores any documents containing her PII in a safe and secure

18

location. Ms. Riddick has never knowingly transmitted unencrypted sensitive PII over the Internet or any other unsecured source.

90.     I.A.C. obtained and continues to maintain Ms. Riddick's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

91.     The Data Breach has caused Ms. Riddick to suffer substantial injury, as well as imminent and impending injury arising from the substantially increased risk of additional fraud, identity theft, and misuse resulting from her PII being placed in the hands of criminals.

92.     As a result of the Data Breach, Ms. Riddick is at present risk and will continue to be at increased risk of additional identity theft and fraud for years to come.

93.     Ms. Riddick has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in I.A.C.'s possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

94.     This civil action is properly maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4). Plaintiffs seek certification of the following class:

> All persons in the United States and its territories whose PII was compromised in the Data Breach.

95.     Excluded from the Class are I.A.C., any entity in which I.A.C. has a controlling interest, and I.A.C.'s officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officers presiding over this matter, members of their immediate family, and members of their judicial staff.

96.     **Numerosity**: The Class Members are so numerous that individual joinder of all Class Members is impracticable. Upon information and belief, at least thousands of individuals'

19

PII was exposed by I.A.C. All Class Members' names and addresses are available from I.A.C.'s records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

97.     **Commonality**: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.     Whether and to what extent I.A.C. had a duty to protect Plaintiffs' and Class Members' PII;

b.     Whether I.A.C. was negligent in collecting and storing Plaintiffs' and Class Members' PII;

c.     Whether I.A.C. had duties not to disclose Plaintiffs' and Class Members' PII to unauthorized third parties;

d.     Whether I.A.C. took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PII;

e.     Whether I.A.C. failed to adequately safeguard Plaintiffs' and Class Members' PII;

f.     Whether I.A.C. failed to implement and maintain reasonable security policies and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

g.     Whether I.A.C. adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

20

h.      Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or punitive damages because of I.A.C.'s wrongful conduct;

i.      Whether Plaintiffs and Class Members are entitled to restitution because of I.A.C.'s wrongful conduct;

j.      Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm they face because of the Data Breach; and

k.      Whether Plaintiffs and Class Members are entitled to identity theft protection for their respective lifetimes.

98.     **Typicality**: Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was disclosed by I.A.C. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through I.A.C.'s common misconduct. Plaintiffs are advancing the same claims and legal theories individually and on behalf of all other Class Members, and there are no defenses that are unique to Plaintiffs. Plaintiffs' claims and Class Members' claims arise from the same operative facts and are based on the same legal theories.

99.     **Adequacy**: Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against I.A.C. to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

100. **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because I.A.C. has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. I.A.C.'s policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on I.A.C.'s conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

101. **Superiority**: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that tens of thousands of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who cannot individually afford to litigate a complex claim against large corporations, like I.A.C. Even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

102. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because I.A.C. would necessarily gain an unconscionable advantage in non-class litigation, since I.A.C. would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume

22

the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by Class Members and will establish the right of each Class Member to recover on the causes of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

103.   The litigation of Plaintiffs' claims is manageable. I.A.C.'s uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with maintenance of this lawsuit as a class action.

104.   Adequate notice can be given to Class Members directly using information maintained in I.A.C.'s records.

105.   Unless a class-wide injunction is issued, I.A.C. may continue to maintain inadequate security with respect to Plaintiffs' and Class Members' PII, I.A.C. may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and I.A.C. may continue to act unlawfully as set forth in this Complaint.

106.   I.A.C. has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

**COUNT I**
**NEGLIGENCE**
**(on behalf of Plaintiffs and the Class)**

107.   Plaintiffs restate and incorporate by reference all preceding paragraphs as if fully set forth herein.

108.   I.A.C. knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' PII.

23

109.    Upon accepting and storing Plaintiffs' and Class Members' PII on its computer systems and networks, I.A.C. undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Plaintiffs' and Class Members' PII from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

110.    I.A.C. owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the PII.

111.    I.A.C.'s duty also included the responsibility to implement processes by which it could detect and analyze a breach of its security systems in a reasonably expeditious period of time and give prompt notice to those affected in the event of a cyberattack.

112.    I.A.C. knew or should have known of the risks inherent in collecting the PII of Plaintiffs and Class Members and the importance of adequate security. I.A.C. was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

113.    I.A.C. owed a duty of care to Plaintiffs and Class Members whose PII was entrusted to it. I.A.C.'s duties included, but were not limited to, the following:

    a.    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII in its possession;

    b.    To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing its networks, systems, protocols, policies, procedures, and

24

practices to ensure that Plaintiffs' and Class Members' PII was adequately secured from impermissible release, disclosure, and publication;

c.     To protect Plaintiffs' and Class Members' PII using reasonable and adequate security procedures and systems compliant with industry standards;

d.     To have procedures in place to prevent the loss or unauthorized dissemination of PII in its possession;

e.     To employ reasonable security measures and otherwise protect the PII of Plaintiffs and Class Members pursuant to the FTCA;

f.     To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

g.     To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

114.     I.A.C.'s duty to employ reasonable data security measures arose, in part, under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

115.     I.A.C.'s duty also arose because I.A.C. was bound by industry standards to protect Plaintiffs' and Class Members' confidential PII.

116.     Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of I.A.C., and I.A.C. owed them a duty of care to not subject them to an unreasonable risk of harm.

117.    I.A.C., through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' PII within I.A.C.'s possession.

118.    I.A.C., by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiffs and Class Members.

119.    I.A.C., by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose PII was compromised.

120.    I.A.C. breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by I.A.C. include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b.    Failing to adequately monitor the security of its networks and systems;

c.    Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d.    Failing to implement and maintain adequate mitigation policies and procedures;

e.    Allowing unauthorized access to Class Members' PII;

f.    Failing to comply with the FTCA; and

g.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

26

121.    I.A.C. acted with reckless disregard for the rights of Plaintiffs and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiffs and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the PII compromised in the Data Breach.

122.    I.A.C.'s breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' PII to be compromised, exfiltrated, and misused, as alleged herein.

123.    As a result of I.A.C.'s ongoing failure to notify Plaintiffs and Class Members regarding exactly what PII has been compromised, Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

124.    I.A.C.'s breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their PII, and/or loss of time and money to monitor their accounts for fraud.

125.    As a result of I.A.C.'s negligence in breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their PII, which is still in the possession of third parties, will be used for fraudulent purposes.

126.    I.A.C. also had independent duties under state laws that required it to reasonably safeguard Plaintiffs' and Class Members' PII and promptly notify them about the Data Breach.

127.    As a direct and proximate result of I.A.C.'s conduct, including, but not limited to, I.A.C.'s failure to implement and maintain reasonable data security practices and procedures, Plaintiffs and Class Members have suffered or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their PII is used; (ii) the publication and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PII, including

27

the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost time and opportunity costs associated with efforts expended to address and mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in I.A.C.'s possession and is subject to further unauthorized disclosures so long as I.A.C. fails to undertake appropriate and adequate measures to protect the PII in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives. Thus, Plaintiffs and Class Members are entitled to damages in an amount to be proven at trial.

128.    The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

129.    Plaintiffs and Class Members have suffered cognizable injuries and are entitled to actual and punitive damages in an amount to be proven at trial.

130.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring I.A.C. to, inter alia, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Class)

131.    Plaintiffs restate and incorporate by reference all preceding paragraphs as if fully set forth herein.

132.    Pursuant to Section 5 of the FTCA, I.A.C. had a duty to provide fair and adequate computer systems and data security to safeguard the PII of Plaintiffs and Class Members.

133.    Plaintiffs and Class Members are within the class of persons that the FTCA intended to protect, and I.A.C.'s failure to comply with both constitutes negligence per se.

134.    I.A.C. breached its duties to Plaintiffs and Class Members under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII, and by failing to provide prompt notice of the Data Breach without unreasonable delay.

135.    Specifically, I.A.C. breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

136.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII (such as the PII compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of I.A.C.'s duty in this regard.

137.    I.A.C. also violated the FTCA by failing to use reasonable measures to protect the PII of Plaintiffs and Class Members, and by not complying with applicable industry standards, as described herein.

138.    I.A.C.'s violations of the FTCA constitute negligence per se.

139.    It was reasonably foreseeable, particularly given the growing number of data breaches of PII, that the failure to reasonably protect and secure Plaintiffs' and Class Members' PII in compliance with applicable laws would result in an unauthorized third-party gaining access to I.A.C.'s networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted PII.

140.    Plaintiffs' and Class Members' PII constitutes personal property that was stolen due to I.A.C.'s negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

141.    As a direct and proximate result of I.A.C.'s negligence per se, Plaintiffs and Class Members have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their PII, including but not limited to damages from the actual misuse of their PII and the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

142.    As a direct and proximate result of I.A.C.'s negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

143.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring I.A.C. to, inter alia, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

144.    Plaintiffs restate and incorporate by reference all preceding paragraphs as if fully set forth herein.

145.    Plaintiffs and Class Members conferred a monetary benefit on I.A.C. by purchasing services and/or labor from I.A.C., along with their PII. In exchange, Plaintiffs and Class Members expected that I.A.C. would implement and maintain adequate and industry-standard data security protections for their sensitive PII.

146.    I.A.C. has retained the benefits of its unlawful conduct by calculating to increase its own profit at the expense of adequate and necessary cybersecurity for Plaintiffs' and Class Members' sensitive PII.

147.    I.A.C. knew that Plaintiffs and Class Members conferred a benefit upon it in the form of payments for its services and/or labor, which I.A.C. accepted. I.A.C. profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes, while failing to fund adequate data security measures that would have secured Plaintiffs' and Class Members' PII and prevented the Data Breach.

148.    If Plaintiffs and Class Members had known that I.A.C. had not adequately secured their PII, they would not have agreed to provide such PII to I.A.C.

149.    Due to I.A.C.'s conduct alleged herein, it would be unjust and inequitable under the circumstances for I.A.C. to be permitted to retain the benefit of its wrongful conduct.

150.    I.A.C. enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

151.    Instead of providing a reasonable level of security that would have prevented the Data Breach, I.A.C. instead calculated to increase its own profits at the expense of Plaintiffs and

Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of I.A.C.'s decision to prioritize its own profits over the requisite data security.

152.    As a direct and proximate result of I.A.C.'s conduct, Plaintiffs and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remains in I.A.C.'s possession and is subject to further unauthorized disclosures so long as I.A.C. fails to undertake appropriate and adequate measures to protect PII in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

153.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from I.A.C. and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by I.A.C. from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

32

154.    Plaintiffs and Class Members may not have an adequate remedy at law against I.A.C., and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the Class)**

155.    Plaintiffs restate and incorporate by reference all preceding paragraphs as if fully set forth herein.

156.    Plaintiffs and Class Members took reasonable and appropriate steps to keep their PII confidential from the public.

157.    Plaintiffs and Class Members had a legitimate expectation of privacy with respect to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

158.    I.A.C. owed a duty to individuals, including Plaintiffs and Class Members, to keep their PII confidential.

159.    The unauthorized release of PII is highly offensive to any reasonable person.

160.    Plaintiffs' and Class Members' PII is not of legitimate concern to the public.

161.    I.A.C. knew or should have known that Plaintiffs' and Class Members' PII was private.

162.    I.A.C. publicized Plaintiffs' and Class Members' PII, by communicating it to cybercriminals who had no legitimate interest in this PII and who had the express purpose of monetizing that information by injecting it into the illicit stream of commerce flowing through the dark web and other malicious channels of communication.

163.    It is therefore substantially certain that Plaintiffs' and the Class Members' PII is rapidly becoming public knowledge—among the community writ large—due to the nature of the malware attack that procured it, and the identity theft for which it is designed.

164.    Moreover, because of the ubiquitous nature of data breaches, I.A.C. was substantially certain that a failure to protect PII would lead to its disclosure to unauthorized third parties, including thousands of waiting identity thieves.

165.    Therefore, by failing to keep Plaintiffs' and Class Members' PII safe, and by misusing and/or disclosing their PII to unauthorized parties for unauthorized use, I.A.C. invaded Plaintiffs' and Class Members' privacy by:

166.    Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

167.    Publicizing private facts about Plaintiffs and Class Members, which is highly offensive to a reasonable person.

168.    Unless and until enjoined, and restrained by order of this Court, I.A.C.'s wrongful conduct will continue to cause irreparable injury to Plaintiffs and Class Members in that I.A.C.'s inadequate data security measures will likely result in additional data breaches. Plaintiffs and Class Members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of Plaintiffs' and Class Members' privacy by I.A.C.

## COUNT V
### DECLARATORY AND INJUNCTIVE RELIEF, 28 U.S.C. § 2201
#### (On Behalf of Plaintiffs and the Class)

169.    Plaintiffs restate and incorporate by reference all preceding paragraphs as if fully set forth herein.

170.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

171.    As previously alleged, I.A.C. was required to provide adequate security for the protection of the PII I.A.C. collected.

172.    I.A.C. owes a duty of care to Plaintiffs and Class Members that required it to adequately secure their PII.

173.    I.A.C. still possesses Plaintiffs' and Class Members' PII, yet does not adequately protect their PII against the threat of another data breach.

174.    I.A.C. has not satisfied its contractual obligations and legal duties to Plaintiffs and Class Members.

175.    Actual harm has arisen in the wake of the Data Breach regarding I.A.C.'s obligations and duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their PII and I.A.C.'s ongoing failure to address the security failings that led to such exposure.

176.    Since the Data Breach, I.A.C. has not announced any changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

177.    There is no reason to believe that I.A.C.'s employee training and security measures are any more adequate now than they were before the Data Breach.

178.    Plaintiffs and the Class Members, therefore, seek a declaration (1) that I.A.C.'s existing data security measures do not comply with its contractual obligations and duties of care

35

to provide adequate data security, and (2) that to comply with its obligations and duties of care, I.A.C. must implement and maintain reasonable security measures, including, but not limited to, being ordered as follows:

    a.    prohibiting I.A.C. from engaging in the wrongful and unlawful acts described herein;

    b.    ordering that I.A.C. engage internal security personnel to conduct testing, including audits on I.A.C.'s systems, on a periodic basis, and ordering I.A.C. to promptly correct any problems or issues detected by such third-party security auditors;

    c.    requiring I.A.C. to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    d.    ordering that I.A.C. engage third-party security auditors and internal personnel to run automated security monitoring;

    e.    ordering that I.A.C. audit, test, and train security personnel and employees regarding any new or modified data security policies and procedures;

    f.    ordering that I.A.C. purge, delete, and destroy, in a reasonably secure manner, any PII not necessary for provision of services;

    g.    ordering that I.A.C. conduct regular database scanning and security checks;

    h.    prohibiting I.A.C. from maintaining PII of Plaintiffs and Class Members on a cloud-based database;

i.      requiring I.A.C. to segment data by, among other things, creating firewalls and access controls so that if one area of I.A.C.'s network is compromised, hackers cannot gain access to other portions of I.A.C.'s systems;

j.      ordering that I.A.C. routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive PII;

k.      requiring I.A.C. to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding paragraphs, as well as randomly and periodically testing employees' compliance with I.A.C.'s policies, programs, and systems for protecting personal identifying information;

l.      requiring I.A.C. to meaningfully educate all Class Members about the threats they face as a result of the loss of their PII to third parties, as well as the steps affected individuals must take to protect themselves;

m.      requiring I.A.C. to implement logging and monitoring programs sufficient to track traffic to and from I.A.C.'s servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate I.A.C.'s compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment; and

n.      such other and further relief as this Court may deem just and proper.

### **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs, individually and on behalf of all others similarly situated, pray for relief as follows:

a. for an Order certifying the Class as defined herein, and appointing Plaintiffs and counsel to represent the Class;

b. for equitable relief enjoining I.A.C. from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

c. for equitable relief compelling I.A.C. to use appropriate cybersecurity methods and policies with respect to PII collection, storage, and protection, and to disclose with specificity to Class Members the types of PII compromised;

d. for an award of damages, including actual, nominal, consequential, enhanced compensatory, and punitive damages, as allowed by law in an amount to be determined;

e. for an award of attorney fees, costs, and litigation expenses, as allowed by law;

f. for pre-judgment and post-judgment interest on all amounts awarded; and

g. such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: June 11, 2026

Respectfully submitted,

*/s/ Oren Faircloth*
Oren Faircloth (Bar No. ct30530)
**SIRI & GLIMSTAD LLP**
100 Pearl Street
14th Floor - #16946876
Hartford, CT 06103
(929) 677-5181
ofaircloth@sirillp.com

Bart D. Cohen (*pro hac vice* forthcoming)
Panida Anderson (*pro hac vice* forthcoming)
**BAILEY & GLASSER, LLP**
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
(202) 463-2101
bcohen@baileyglasser.com
panderson@baileyglasser.com

David D. Bibiyan (*pro hac vice* forthcoming)
Younjin (Jennifer) Lee (*pro hac vice* forthcoming)
**BIBIYAN LAW GROUP, P.C.**
1460 Wilshire Boulevard
Los Angeles, California 90024
Telephone: (310) 438-5555
david@tomorrowlaw.com
jlee@tomorrowlaw.com

*Counsel for Plaintiffs and the Proposed Class*